2022 IL App (2d) 190831-U
No. 2-19-0831
Order filed February 10, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of DeKalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-619 |
| ALEJANDRO GONZALEZ, | ) ) ) | Honorable Robbin J. Stuckert, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in granting the State's motion for discretionary transfer from juvenile to criminal court, as its findings based on the statutory factors in the Juvenile Court Act were an exercise of sound judicial discretion. Defendant's trial counsel was not ineffective for failing to present a motion to suppress defendant's statements to police because there exists no reasonable probability that the trial court would have granted such a motion. The trial court did not err in denying defendant's post-trial motion in arrest of judgment. The evidence presented was sufficient to support the trial court's finding of defendant's guilt beyond a reasonable doubt.

¶ 2    Defendant, Alejandro Gonzalez, appeals his conviction of ten counts of aggravated

criminal sexual assault in violation of sections 11-1.30(b)(i) and (b)(ii) of the Criminal Code of

2012 (Criminal Code). 720 ILCS 5/11-1.30(b)(i), (ii) (West 2018). He contends that the trial court erred when it (1) granted the State's motion for discretionary transfer from juvenile to criminal court pursuant to section 5-805(3) of the Juvenile Court Act of 1987 (Juvenile Court Act). 705 ILCS 405/5-805(3) (West 2016); (2) found defendant had been proven guilty on all counts beyond a reasonable doubt; and (3) denied his post-trial motion in arrest of judgment pursuant to section 116-2 of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure). 725 ILCS 5/116-2 (West 2018). Defendant additionally contends that he received ineffective assistance of trial counsel.

¶ 3                                     I. BACKGROUND

¶ 4                                  Pretrial Proceedings

¶ 5       On August 31, 2015, then-17-year-old defendant[1] was arrested on ten counts of aggravated criminal sexual assault. He was charged as an adult. On September 14, 2015, a DeKalb County grand jury returned a true bill of indictment charging defendant with ten acts of aggravated criminal sexual assault, alleged to have been committed between August 18, 2013, and June 9, 2015. Counts I-V alleged that defendant, who was under 17 years of age, committed an act of sexual penetration with M.G., who was at least nine years of age but under 13 years of age, and that by the use of force or threat of force, placed his penis in the anus of M.G. in violation of section 11-1.30(b)(ii) of the Criminal Code. 720 ILCS 5/11-1.30(b)(ii) (West 2018). Counts VI-X alleged that defendant committed the offense of aggravated criminal sexual assault in that defendant was under 17 years of age and committed an act of sexual penetration with the minor B.G., who was under nine years of age, and defendant placed his penis in the anus of B.G. in

_____

[1] Defendant's DOB is May 10, 1998.

violation of section 11-1.30(b)(i) of the Criminal Code. 720 ILCS 5/11-1.30(b)(i) (West 2018). Defendant's age during the alleged date range placed him under the protection and provisions of the Juvenile Court Act (705 ILCS 405/1 *et seq*).

¶ 6    On October 2, 2015, defendant's counsel raised a bona fide doubt as to defendant's fitness to stand trial. An order was entered, and Dr. Jane Braden was appointed to perform an initial fitness evaluation on defendant. Dr. Braden issued a November 9, 2015, report stating as her initial finding that a bona fide doubt as to defendant's fitness existed. Dr. Braden was then ordered to complete a full fitness evaluation on defendant. Her full fitness report, dated January 16, 2016, consisted of evaluations of defendant on November 25, 2015, and December 29, 2015. Dr. Braden's summary and opinions of those evaluations was that defendant was unfit for trial. Braden wrote in her report that defendant has felt hopeless his entire life and told her that he wanted to die. She recounted defendant having repeatedly attempted suicide.

¶ 7    A hearing on defendant's fitness was held on February 22, 2016. In addition to her submitted report, Dr. Braden testified at the hearing and offered her opinion that defendant's best interests would be served by allowing him to continue outpatient services while in the custody of his father until a bed became available in an inpatient hospital setting. Dr. Braden believed that if defendant were taken out of his familiar home environment, he may "decompensate" and take a longer time to be restored to fitness. Following Dr. Braden's testimony, the trial court found defendant unfit for trial and ordered him to remain in the custody of his father until an inpatient bed became available with the Department of Human Services.

¶ 8    On May 5, 2016, the trial court conducted another hearing on defendant's fitness and was presented with a report from Dr. Joseph McNally, a board-certified psychiatrist that had been treating defendant at Streamwood Behavioral Health Care. Dr. McNally's report opined that

defendant was fit to stand trial. The trial court accepted the report's findings and made its own finding, stipulated to by the parties, that defendant had been restored to fitness. Defendant was released to his father's custody.

¶ 9       On February 7, 2017, the State filed a motion for discretionary transfer from juvenile court to criminal court pursuant to section 5-805(3) of the Juvenile Court Act (705 ILCS 405/5-805(3) (West 2016)), alleging that it was not in the best interests of the public to continue defendant's proceedings under the Juvenile Court Act. Hearings on the State's motion were held on March 17 and May 3, 2017, before Judge Marcy Buick. Prior to witness testimony, the trial court admitted police reports and interviews conducted with the minor victims.

¶ 10      Dr. Jane Braden, a clinical psychologist, declared an expert in her field by the trial court, was called to testify by defendant. She recalled having seen documentation that defendant had been diagnosed with bipolar disorder and depression. She recounted her evaluations of defendant in which he told her that he heard voices and suffered from auditory and visual hallucinations. Dr. Braden opined that defendant's mental health was in a fragile state and was concerned that his mental health may deteriorate if confined before trial. She recommended defendant be subject to intensive outpatient treatment and partial hospitalization for mental health treatment. She testified that defendant's IQ put him in the low average range.

¶ 11      The State called Michael Venditti, the juvenile probation supervisor for DeKalb County Court Services, to testify. Venditti testified that a juvenile charged with aggravated criminal sexual assault would typically undergo a sex offender treatment evaluation completed by a certified therapist. Venditti said that he was aware of two agencies in the area that provide sex offender treatment for juveniles. It was possible, in Venditti's experience, that a person of defendant's age (nearly 19 at the time of the hearing) to complete sex offender treatment while still under the

jurisdiction of the juvenile court. When a sex offender is on probation following a juvenile court disposition, Venditti said that community-based treatment is employed unless the sex offender evaluation provides that such treatment poses too great a risk to community safety. He was not aware of any inpatient sex offender treatment programs available to defendant in Illinois. Venditti testified that while residential treatment facilities for juveniles do exist in the state, the individual would have to be under the age of 18 prior to entering such a facility. He did not specify as to sex offender specific treatment programs available within the Illinois Department of Juvenile Justice.

¶ 12     On May 12, 2017, the trial court judge granted the State's motion for discretionary transfer from juvenile court to criminal court. In granting the State's motion, the trial court found that

> "The statutory analysis in this case is found in 705 ILCS 405/5-905(3). Under that analysis first the Court does find there is probable cause to believe that the allegations in the State's motion are true. Specifically there is probable cause to believe that the defendant committed the offenses alleged by indictment in this case and that the defendant was 15 and 16 years old at the time the offenses were committed.
>
> The second part of the analysis as to whether or not it is in the public's best interest to allow the defendant's case to proceed under the Juvenile Court Act, the Court considered the following relevant factors: This defendant is 18 years old. He will be 19 years old in one month on June 10, 2017. If he were to plead guilty or be found guilty of these offenses, the juvenile court would have jurisdiction over him only until June 10, 2019.
>
> As to the history of the defendant, he alleges he was sexually abused as a child. He has no prior delinquency history. He is reported to be of low average intelligence. He has been diagnosed with depression and bipolar disorder. He has been prescribed medications for these diagnoses. He has alleged that he experiences hallucinations. He has been

employed. He has received an education. He attended school and in spite of these mental health issues, some of which may be caused by the fact that he's been charged in this case, he has been able to function in society.

As to the circumstances of the offenses alleged in this case, all of these offenses are charged as Class X felonies. Aggravated criminal sexual assault, they are all very serious charges. He is charged as the sole actor. This is not a case where it alleged he is accountable for somebody else's actions.

There is evidence the offenses were committed in an aggressive and premeditated manner. There are allegations the defendant threatened harm to the victims if they told anyone of these alleged acts. In addition, the offenses as alleged are by their very nature aggressive acts.

As to treatment programs, there are treatment programs for individuals convicted of these types of offenses in both the juvenile court system and the adult justice systems.

As to whether the security of the public requires sentencing under the Unified Code of Corrections, this defendant has no history of court-ordered services and it is unknown whether he would participate meaningfully in services if ordered.

Is there a reasonable likelihood he can be rehabilitated before the expiration of the possible juvenile court jurisdiction? Again, there simply is no information to suggest that he can be rehabilitated within two years' time.

And as to the adequacy of punishment or services under the Juvenile Court Act, in this case two years of the remaining juvenile court jurisdiction is not adequate for these offenses. If he were to not cooperate with services or need additional time to be rehabilitated, the Court would lose jurisdiction and cannot order the case to be continued

or order that more services be put in place beyond his 21st birthday, and given the seriousness of these charges and that time frame, the security of the public cannot be assured and the Court must and does conclude that it is not in the best interests of the public to proceed with this case under the Juvenile Court Act and so the State's motion is granted."

¶ 13                                                    Trial

¶ 14    The bench trial commenced on June 5, 2018. The State first called victim M.G. At the time of his testimony, M.G. was 13 years old and going into eighth grade. His younger sister is victim, B.G. Defendant is M.G. and B.G.'s cousin. M.G. testified that he had not seen or had contact with defendant in nearly three years prior to his testimony but used to spend every weekend with him for years prior to August 2015, beginning when M.G. was in preschool. M.G. recalled visiting defendant at his house in what he believed was Sycamore. Defendant lived in the Sycamore house with his parents.

¶ 15    M.G. testified that during visits to defendant's house, defendant "would have touched my anus" on "the inside" with "his penis." M.G. said that this inappropriate touching lasted from when he was in preschool until he was 10 years old. He could not recall how many times it had happened except to say it "has been a lot." He recounted that defendant would touch him in the described manner "when we ever came over" to defendant's house. The touching would occur in either defendant's or defendant's mother's bedroom. M.G. recalled that incidents occurring in defendant's bedroom involved defendant "either on the bed or standing," putting his hands around M.G.'s waist and "his penis would have been in my anus." He stated that he couldn't get away because he "was very weak and he always held on very tight." M.G. noticed blood when he went to the bathroom following the contact with defendant.

¶ 16    The "few times" that defendant touched M.G. in defendant's mother's room, M.G. would be on the bed or by a chair on his knees with his hands on the bed. He stated that this happened "more than ten times" at the "new house." When asked by the State if he knew if ten times was "for sure *** the number of times," M.G. responded "[f]or sure." He was then asked if it "[c]ould have happened more times than that even?" M.G. responded in the affirmative.

¶ 17    M.G. testified that defendant "said to me that if I ever told my mom or dad or anybody else, that I would have gotten in trouble." During the times that the alleged incidents occurred in defendant's house, M.G.'s parents and sister would be in the living room or kitchen.

¶ 18    M.G. recalled the evening of August 11, 2015, when his sister, B.G., told their parents what had happened with defendant. M.G. was told to go into his parents' room while they spoke with B.G. When his mother asked him if what B.G. had told them was true, M.G. testified that he tried to "keep it like nothing had happened but then [his] mom said [B.G.] had told and [he] broke." M.G.'s mother recorded the conversation with he and B.G. The family then left and went to defendant's house.

¶ 19    There, M.G.'s parents played the recording of the conversations with the M.G. and B.G. Defendant arrived sometime later and denied the accusations when confronted by M.G.'s parents. M.G. recalled one of his parents telling defendant "A kid doesn't just say something like that happening to him." Defendant, according to M.G., responded "that he didn't know it was wrong." Before M.G. and his family left defendant's home, defendant said "that it had happened to him." After the family left, M.G.'s mother called the police, and they went to the police station. M.G. recalled police questioning his mother that night but was not himself interviewed by an investigator until several days later.

¶ 20    On cross-examination, M.G. testified that the home at which he would visit defendant was "His first one, the blue green one with the backyard and the mobile one." M.G. was shown Defendant's Exhibit A and identified the photograph therein as defendant's "first house" and "the blue house." When asked if the house identified in the photograph was "the Sycamore home" that M.G. had earlier spoke about, he stated that he could not remember, but reiterated that it was the house where defendant began touching him inappropriately. He could not recall how many times defendant touched him inappropriately in that house, except to say that it had been "more than ten."

¶ 21    M.G. testified that the inappropriate contact occurring in defendant's mother's room happened in both "the old house and new house." He was shown Defendant's Exhibit B and identified the photograph therein as defendant's "new house" and "the yellow house." The incidents that occurred in defendant's room happened exclusively in the "old house" or the "blue house."  M.G. could not recall how many times defendant touched him inappropriately in the "yellow house" except to say that it had been "more than ten."

¶ 22    M.G. admitted that he told his parents that he could not remember how many times defendant touched him, or in which house the incidents occurred. When asked to clarify how he could be sure of how many times the incidents occurred at the time of his trial testimony, he stated "because certain memories keep coming up." M.G. testified that inappropriate touching from defendant did not happen every time he visited the house, "it happened most of the time I went."

¶ 23    Defense counsel asked M.G. if he had told his mother on September 18, 2015, in which house the incidents had occurred. M.G. recalled that he "said it happened in the house that they live in now." Defense counsel then played Defendant's Exhibit C; a recording made on September 18, 2015. The recording was of M.G.'s mother asking him about which house the incidents with

defendant had occurred. He told his mother on September 18, 2015, that the incidents all happened in the old house.

¶ 24    On redirect examination, M.G. stated that the incidents with defendant happened in both defendant's old house and new house. He further testified that incidents in the new house occurred in defendant's room and defendant's mother's room.

¶ 25    The State then called B.G. to testify. At the time of her testimony, B.G. was 11 years old and entering the sixth grade. She had not seen defendant since 2015. Prior to that time, B.G. testified that she and her family would go to defendant's home every Sunday. She could only remember having visited defendant's new house depicted in Defendant's Exhibit B. During a visit to defendant's home in "wintertime" when she was in "second grade," B.G. said defendant had her sit "on his lap" in "a lazy chair" in his room with both of their pants off. Defendant placed his hands on her waist and put his penis inside "her butt." This, according to B.G., happened in defendant's room "about five times."

¶ 26    B.G. testified that this also occurred in defendant's mother's room "on the chair." She stated that defendant put his penis inside "her butt" in that room more than five times. Her parents would be in the dining or living room with defendant's parents when these incidents occurred. On one occasion, while spying on her brother, M.G., and defendant in defendant's room, she testified that she "saw [defendant] putting his penis *** in my brother's butt."

¶ 27    She recalled the evening of August 11, 2015, when she and her family were watching a movie at home. While watching the movie, B.G. saw "two horses fighting" and told her parents that "it kind of looked like what happened to us." She then told her parents about what had happened with defendant and the family went to his home.

¶ 28    On cross-examination, B.G. admitted that she could not say how many times defendant inappropriately touched her in defendant's mother's room. She was asked by defense counsel about where she was when she observed defendant put his penis in M.G.'s butt, to which she stated that she was "right at the door." She could not recall telling Investigator Tunney that she was under the bed and saw M.G.'s feet go up and down when witnessing the event.

¶ 29    On redirect examination, B.G. said that she could not remember exactly how many times defendant touched her inappropriately because of "bad memory" and agreed that she was not counting every time that it happened. On recross examination, B.G. testified that defendant never told her not to tell her parents about any of the alleged incidents.

¶ 30    The State next called Sherry Krueger, nurse practitioner and medical provider with the Medical Evaluation Response Initiative Team at the University of Illinois College of Medicine Clinic. After being qualified by the trial court as an expert in the field of child sexual abuse, Krueger testified that she met with M.G, B.G., and their mother on August 19, 2015. She learned that B.G. had been treated and was currently taking medication for chronic constipation. Krueger learned of B.G.'s history of urinary tract infections, encopresis, and behavioral concerns. She also learned of M.G.'s history of constipation and signs of depression.

¶ 31    B.G. spoke with Krueger in private and told her that defendant had put his penis in her butt. She also spoke privately with M.G. who said that defendant has put his penis into his rectum. She conducted medical examinations of both children. Krueger's examinations revealed nonspecific findings of anal laxity, consistent with both sexually abused children and those with a history of constipation.

¶ 32    The victims' father, Marco G., was next called to testify. Defendant is Marco's nephew, the son of his sister, Martha. Marco recalled the events of August 11, 2015, and said B.G. made a

comment during the movie the family was watching. Her comment prompted Marco and his wife to record the subsequent conversation. The recorded conversation, People's Exhibit 1, was then played in open court. Marco testified that the recording was accurate and confirmed that the recording contained B.G. saying that the defendant had "touched her private" and "puts it in the butt." He also confirmed that the recording contained M.G. saying "I don't remember" when asked by Marco what had happened with defendant. M.G. responded "I don't know" when asked by his father "How many times he did it?" Marco and his family then went to defendant's home.

¶ 33    When the family arrived at defendant's home, only defendant's parents, Martha and her husband, Isidro, were there. He told them what he learned from B.G. and M.G. Shortly after, defendant arrived at the house and Marco asked him "why he did that to my children." Defendant initially denied knowing to what Marco was referring, but eventually said "that he did it because *** they did it to him, too, as well." Marco testified that he became enraged and started yelling at defendant. He then threw a chair away from the kitchen table at which he and defendant were seated and pushed the table toward defendant.

¶ 34    The State called Officer Joseph Meeks to testify. Meeks was called to defendant's home on the evening of August 11, 2015. He met with defendant and his parents in the kitchen with another officer present. Meeks asked defendant to explain what had happened that night. Defendant responded that he had come home from work when confronted by his aunt and uncle about assaulting B.G. and M.G. Meeks testified that defendant said that the accusations were true. Meeks went on to testify that defendant told him "that it had begun when he himself was 12 years old *** and that it initially began with just touching. He began with [M.G.], the young one." Meeks further stated that defendant told him "that he touched [M.G.'s] penis and then he had [M.G.] touch his penis and then he stated that he wanted to experiment was his word, and that [defendant] placed

his \*\*\* penis between the butt cheeks of [M.G.]" Defendant told Meeks that he was not sure if had penetrated M.G.

¶ 35    Regarding B.G., Meeks testified that defendant said, "he had committed similar acts with [B.G.], inappropriate touching and had also placed his penis between her butt cheeks." Meeks said defendant told him that he'd stopped touching the children approximately a year prior to August 11, 2015. Defendant told Meeks that "being angry, confused" and "sexually abused when he was younger" caused him to assault B.G. and M.G. Meeks advised defendant's parents to watch over defendant and told them that the case would be referred to the investigations division. Meeks then left defendant's home.

¶ 36    On cross-examination, Meeks admitted that his report of the interaction with defendant on August 11, 2015, reflected that defendant said he "may" have penetrated M.G.'s butt cheeks. He further admitted that defendant never gave explicit details regarding acts with B.G., only that he had done "similar things" with her that he did with M.G.

¶ 37    The State next called Investigator Chris Tunney. Tunney interviewed the children at the Kane County Child Advocacy Center on August 17, 2015. Video recordings of those interviews were admitted by the trial court pursuant to section 115-10 of the Code of Criminal Procedure (725 ILCS 5/115-10 (West 2016)), over defendant's standing objection to their reliability. Tunney testified to the accuracy of the recordings, and they were played in open court.

¶ 38    In the recorded interview, M.G. said that he could not remember what grade he was in when the sexual acts with defendant first occurred. He said that his family would go visit defendant's family about once a week or on the weekends, but defendant did not touch him on every visit. He was not sure how many times it happened. He was not sure whether it happened more than five times. He could only remember defendant touching him the first time, the last time,

and one other time it happened. The first time was in defendant's mother's bedroom at the blue house while M.G.'s and defendant's parents were in the kitchen. The other two times M.G. could remember what occurred with B.G. present while watching TV in defendant's mother's room, the last time "in the house that [defendant] lives in now." M.G. later stated that the one other time it happened was in defendant's room. M.G. told Tunney that the last time it happened was approximately three weeks prior to the interview.

¶ 39     In the recorded interview with B.G., she said she could not remember the first time any acts occurred with defendant. She told Tunney that her mom had told her, but she could not remember. B.G. said that it happened every time her family went to defendant's home, but sometimes it didn't. She said defendant would hurt her family if she ever told anyone about it.

¶ 40     B.G. recalled that sometimes the incidents would occur in defendant's room, and other times in his mother's room. When describing a time it happened in defendant's mother's room, B.G. told Tunney that defendant put his "pee pee" in her butt. B.G. said that when defendant did that, it always happened in defendant's mother's room. She said defendant would do it to her before M.G., but M.G. sometimes escaped and tricked her into staying in the room with defendant. She recalled a time that, while hiding under the bed, she saw M.G.'s feet go up and down like he was jumping while on the bed with defendant.

¶ 41     Following Tunney's testimony, the State rested. The trial court denied defense counsel's motion for a directed finding. The matter was continued to July 27, 2018. At the commencement of the July 27 trial date, the State requested leave to amend the indictment to reflect August 18, 2013, to May 9, 2015, as the date range of each of the ten charged counts of aggravated criminal sexual assault. The State prosecutor told the trial court that defense counsel agreed to withdraw an August 2016, motion to dismiss in exchange for the State's agreement to amend the date in the

indictment. The trial court granted the leave to the State to amend the indictment with no objection from defense counsel.

¶ 42    Defendant first called Tammy Spooner, a medical records custodian for VNA Health Care in Aurora. Spooner testified that a July 11, 2015, office visit report noted that B.G. denied "ever being inappropriately touched or made to do something she did not want to do." The report indicated that her mother stated the B.G. denied any inappropriate contact as well.

¶ 43    Rhiannon G., M.G. and B.G.'s mother, was next called to testify. She recorded a conversation she had with M.G. on September 18, 2015, in which he told her the incidents with defendant occurred at "the other house, not the one that they live in now." Rhiannon identified Defendant's Exhibit A as defendant's "old house" and believed that was the house to which her son was referring. She confirmed that her family would visit defendant's family every weekend at both the old and new house. Rhiannon never suspected defendant had done anything with the children.

¶ 44    Defendant's father, Isidro Gonzalez testified next for the defense. He identified Defendant's Exhibit A as a house he owned in De Kalb. He said that M.G. and B.G.'s family did not visit that house frequently due to Marco G.'s then-work schedule. Defendant's Exhibit E is a warranty deed reflecting Isidro Gonzalez's July 13, 2012, sale of the De Kalb house depicted in Defendant's Exhibit A. He identified Defendant's Exhibit B as defendant's current residence, a yellow mobile home in Sycamore his family moved to after selling the De Kalb house. He testified that M.G. and B.G. had only visited their current residence two or three times per year.

¶ 45    The trial court issued its findings and verdict on September 27, 2018. The trial court said

>    "The Court has taken into consideration all of the evidence *** heard. The Court
>    finds all the witnesses to be credible, the minors specifically. Although, as I indicated, there

may have been some inconsistencies as to place and time, the Court is taking into consideration the ages of the children and difficulty in testifying regarding these matters. ***.

The Court finds that the State has proven all elements of this offense beyond a reasonable doubt and there will be verdicts of guilty as to each count."

We will examine the trial court's specific findings as to defendant's guilt in greater detail in our analysis below.

¶ 46                                    Post-Trial Proceedings

¶ 47    On January 4, 2019, defendant's new counsel, Robert Nolan, filed a post-trial motion containing sections titled "defendant's motion in arrest of judgment" and "motion for a new trial." In his motion in arrest of judgment, defendant argued that "the State's indictment in this case was so lacking in specificity and detail, that it deprived the defendant of the ability to present his defense, and thus violated his right to due process." Relevant here, his motion for a new trial argued that (1) he was not proven guilty beyond a reasonable doubt; and (2) his due process rights and right to a fair trial were violated due to his trial counsel's failure to file a motion to suppress statements made to Officer Meeks.

¶ 48    On March 21, 2019, the trial court held an evidentiary hearing on defendant's post-trial motion. Defendant's trial counsel, Marissa Hanson, testified that she did not file a motion to suppress defendant's confession. When asked why she failed to do so, she responded "Because of the fact that we didn't know if we were going to have a bench or jury trial, if this was, in fact, going to be the judge hearing the case, we didn't want her to hear that evidence." She agreed when Nolan suggested "Better [the judge] hears that evidence at trial; is that right?"

¶ 49    The trial court denied defendant's motion in arrest of judgment and motion for a new trial. On August 22, 2019, the trial court sentenced defendant to 35 years' imprisonment on 10 consecutive three-and-a-half year sentences, and three years to life mandatory supervised release.[2]

¶ 50    Defendant filed this timely appeal.

¶ 51                                    II. ANALYSIS

¶ 52    In this appeal, defendant raises four contentions. First, he contends that the trial court erred when it granted the State's motion for discretionary transfer from juvenile to criminal court pursuant to section 5-805(3) of the Juvenile Court Act. 705 ILCS 405/5-805(3) (West 2016). Second, he contends that he received ineffective assistance of trial counsel. Third, he contends that the trial court erred when it found that he had been proven guilty on all counts beyond a reasonable doubt. Fourth, he contends that the trial court erred in denying his post-trial motion in arrest of judgment pursuant to section 116-2 of the Code of Criminal Procedure. 725 ILCS 5/116-2 (West 2018). We begin with defendant's first contention.

¶ 53    Defendant raises several issues with the trial court's reasoning in granting the State's motion to transfer from juvenile to criminal court. Defendant argues that the trial court (1) failed

_____

        [2] Defendant's convictions were for Class X felonies; six years representing the minimum term allowed by statute. See 730 ILCS 5/5-4.5-25(a) (West 2018). We recognize that the sentence imposed here is unique and inconsistent with the statute's strictures. However, this matter is not before this court and we need not address it. "[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties. Counsel almost always know a great deal more about their cases than we do * * *. [Citation.]" *Greenlaw v. United States*, 554 U.S. 237, 244 (2008).

to give weight to the holding in *Miller v. Alabama*, 567 U.S. 460 (2012); (2) was not presented with adequate evidence to determine whether defendant could receive sex offender specific treatment while still under juvenile court jurisdiction; and (3) noted that defendant's alleged offenses were committed in an aggressive manner when no such evidence was presented.

¶ 54    In Illinois, a minor over age 13 may be prosecuted as an adult under the criminal laws of the State if a juvenile court determines, in its discretion, that there is probable cause to believe the allegations in a transfer motion are true and it is not in the best interests of the public to proceed under the Act. 705 ILCS 405/5–805(3)(a) (West 2016). In determining whether to transfer a juvenile, the court must consider, among other things,

"(i) the age of the minor;

(ii) the history of the minor, including:

(A) any previous delinquent or criminal history of the minor,

(B) any previous abuse or neglect history of the minor, and

(C) any mental health, physical, or educational history of the minor or combination of these factors;

(iii) the circumstances of the offense, including:

(A) the seriousness of the offense,

(B) whether the minor is charged through accountability,

(C) whether there is evidence the offense was committed in an aggressive and premeditated manner,

(D) whether there is evidence the offense caused serious bodily harm,

(E) whether there is evidence the minor possessed a deadly weapon;

(iv) the advantages of treatment within the juvenile justice system including whether there are facilities or programs, or both, particularly available in the juvenile system;

(v) whether the security of the public requires sentencing under Chapter V of the Unified Code of Corrections:

(A) the minor's history of services, including the minor's willingness to participate meaningfully in available services;

(B) whether there is a reasonable likelihood that the minor can be rehabilitated before the expiration of the juvenile court's jurisdiction;

(C) the adequacy of the punishment or services." 705 ILCS 405/5–805(3)(b) (West 2016).

¶ 55 The purpose of a transfer proceeding is to balance the best interests of the juvenile offender, particularly as his interests relate to his potential for rehabilitation, against the public's interest in being protected from crime. *People v. Morgan,* 197 Ill. 2d 404 (2001). The history of the transfer statute makes clear that a juvenile judge in a transfer proceeding must weigh relevant statutory and nonstatutory factors in striking the balance for society by transferring the alleged juvenile offender or in striking the balance for the minor by retaining jurisdiction. *People v. Clark,* 119 Ill. 2d 1, 12 (1987).

¶ 56 To that extent, a juvenile judge must receive and consider evidence as to each statutory factor. *Clark,* 119 Ill. 2d at 18. A juvenile judge must evaluate (1) information concerning the type of facilities available for the treatment or rehabilitation of the minor; and (2) must evaluate the likely effectiveness of those facilities in light of the history and present circumstances of the minor. *Morgan,* 197 Ill. 2d at 428–29. A juvenile judge should also consider critical nonstatutory elements such as the resulting sentence if the minor is convicted under the Criminal Code. *Clark,* 119 Ill.

2d at 14. A harsh penalty that is mandated upon conviction is a factor to be weighed in determining whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority. *Id.* at 15. Adequate balancing under the statute requires consideration of which penalty would best serve both interests at stake. *Id.*

¶ 57     The decision to permit prosecution of a juvenile under the criminal law is a matter of judicial discretion, although that discretion is limited and controlled by the Juvenile Court Act. See 705 ILCS 405/1–1 *et seq.* (West 2014). To affirm an order transferring a minor to criminal court, this court must determine if there was sufficient evidence in the record as to each statutory factor to support the transfer order. *Morgan,* 197 Ill. 2d at 428. The mere recitation in the record that all statutory factors have been considered is not enough to affirm a discretionary transfer order. *Clark,* 119 Ill. 2d at 18.

¶ 58     At the hearing on the State's motion to transfer defendant from juvenile to criminal court, the record indicates the State presented the trial court with police reports regarding defendant's offenses, as well as DVD recordings of the children's interviews with Investigator Tunney. Defendant provided the trial court with his school records, reports of his mental health treatment, the legislative history of section 5-805 of the Juvenile Court Act, and relevant case law that included *Miller v. Alabama.*

¶ 59     As defendant was facing the possible imposition of ten consecutive sentences, each with a range of 6 to 30 years, the juvenile court should take into account the reasoning of *Miller* concerning punishment of juveniles when ruling on a motion to transfer to the criminal court pursuant to section 405/5-805 of the Juvenile Court Act. See *People v. Patterson*, 2016 IL App (1st) 101573-B, ¶ 21. In *Miller*, the Supreme Court reasoned:

"[G]iven all we have said * * * about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to the harshest possible penalty will be uncommon. That is especially so because of the great difficulty *** of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' *** [W]e require [sentencing courts] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Miller,* 567 U.S. at 479-80.

¶ 60 The hearing on the State's motion to transfer defendant to criminal court was not a sentencing court as contemplated in *Miller.* As articulated in *Patterson*, juvenile courts *should* take the reasoning in *Miller* into account when ruling on such motions. Before making its ultimate findings, the trial court stated that

"In ruling, the Court has considered the record by judicial notice, the testimony of the witnesses, exhibits admitted into evidence, case law submitted to the Court by the parties and statutory authority."

Based on the trial court's statement, we must assume it considered *Miller* as defendant submitted that case law at the hearing. We cannot agree with defendant that the trial court failed to give weight to the holding in *Miller* in making its ultimate determination on defendant's transfer. However, where, as here, a juvenile is facing two extremes, incarceration to age 21 under the Juvenile Court Act, or 60 to 300 years' imprisonment under the Criminal Code, adequate balancing calls for consideration of which penalty would best serve both of the interests at stake. *Clark*, 119 Ill. 2d at 15.

¶ 61     In *People v. Clark*, the State alleged at defendant's transfer hearing that he had murdered two people and committed aggravated criminal sexual assault. *Clark*, 119 Ill. 2d at 15. The defendant was 14 years old and facing either incarnation to age 21 under the Juvenile Court Act[3], or incarceration for life without possibility of parole under the Criminal Code. *Id*. at 15. The court determined that neither of the two potential sentencing outcomes were considered by the juvenile court, and the record was devoid of any indication that the attorneys or juvenile judge were aware that the defendant would be imprisoned for his natural life if tried and convicted under the Criminal Code. *Id*. As such, the juvenile judge was unable to consider whether or not lifetime imprisonment of the defendant was in his best interests or was required for the security of society. *Id*. at 16. The court held "that no informed judgment can be made about the disposition which will best serve the alleged juvenile offender and society where, as here, there is not the slightest consideration of how either society or the defendant would benefit by his incarceration until death." *Id*.

¶ 62     Here, defense counsel asked the trial court "to consider *** that while these circumstances are extremely serious, if *** this is transferred to an adult court, he stands *** to be convicted and to receive a sentence of between 60 and 300 years." The trial court noted, in its ruling, that all of defendant's alleged offenses were "charged as Class X felonies." The trial court went on to note that "they are all very serious charges." The trial court then considered the statutory factors under sections 5-805(3)(b)(v)(A), (B), and (C) of the Juvenile Court Act, regarding whether the security of the public requires sentencing under the Criminal Code. See *supra* ¶ 12. Therefore, even though the trial court did not explicitly articulate its consideration of *Miller*, the record shows that the

---

[3] The defendant's transfer hearing was conducted under an earlier version of the Juvenile Court Act (Ill.Rev.Stat.1983, ch. 37, par. 701–1 *et seq*).

court was presented with the case law by defendant, acknowledged its consideration, and made proper findings on the potential sentencing outcomes as required by our supreme court in *Clark*.

¶ 63    Defendant's claim that the trial court noted defendant's alleged offenses were committed in an aggressive manner when no such evidence was presented is not supported by the record before us. As stated above, the State presented the trial court with police reports related to the offenses, and DVD recordings of M.G. and B.G.'s interviews. The evidence presented supported the trial court's finding that "defendant threatened harm to the victims if they told anyone of these alleged acts." Defendant cites to no authority for his position except to say that the court "had before it no such evidence" of aggression. The record here shows that the trial court was presented with adequate evidence to support its finding that "the offense was committed in an aggressive and premeditated manner" as required by statute. 705 ILCS 405/5-805(3)(iii)(C) (West 2014).

¶ 64    Next, defendant argues that the trial court, in granting the State's transfer motion, did not consider the possibility that there existed a reasonable likelihood that he could be rehabilitated while still under the jurisdiction of the juvenile court. Defendant avers that the trial court was not presented with substantive evidence concerning his psychiatric care, individual counseling, or level or risk following a sex offender evaluation to determine whether his presence in the community posed a risk to the safety of the public.

¶ 65    Returning to *Clark*, "previous history of the minor" and "whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor" are interrelated factors. *Clark*, 119 Ill. 2d at 16. Juvenile judges evaluate the likely effectiveness of available facilities for treatment or rehabilitation based on the personal and social history of the defendant. *Id.* at 17. A proper evaluation of defendant's history includes

"[R]eceipt and review of information about such factors as social adjustment, mental and physical health, school adjustment, adjustment in the family and familial support for any possible treatment or rehabilitation in addition to any previous involvement with the juvenile justice system." *Id*.

Our supreme court noted that the juvenile judge shall "receive and evaluate information about the type of facilities available for the treatment or rehabilitation" of defendant. *Id*. If the juvenile judge is not presented with information on these factors, the court is authorized "to cause an investigation to be made into these factors." *Id*.

¶ 66    Here, defendant points to Michael Venditti's testimony that part of the probation department's pre-adjudication practice in cases involving the aggravated criminal sexual abuse would be to require a sex offender evaluation to be completed. The evaluation would indicate a high or low risk. Venditti testified that if a person of defendant's age received a low score on the evaluation, the person could complete rehabilitation treatment "well in advance" of the juvenile court's loss of jurisdiction. Defendant never completed a sex offender evaluation. He was one month shy of his 19th birthday at the time of the hearing.

¶ 67    In determining whether there was a reasonable likelihood defendant could be rehabilitated before the expiration of juvenile court jurisdiction, the trial court found "there simply is no information to suggest that he can be rehabilitated within two years' time." Although Venditti's testimony suggests a person with a low score on the evaluation could complete treatment in less than 2 years, the trial court's finding on this issue is supported by the other evidence presented.

¶ 68    The trial court was presented with Dr. Braden's reports and testimony. Braden's report is detailed in full above (supra ¶ 6). It was Braden's opinion that defendant's mental health was in a fragile state and she expressed concern that his mental health may deteriorate if confined before

trial. She recommended defendant be subject to intensive outpatient treatment and partial hospitalization for mental health treatment. She testified that defendant's IQ put him in the low average range. Indeed, the trial court considered this evidence in finding

> "[D]efendant *** alleges he was sexually abused as a child. *** He is reported to be of low average intelligence. He has been diagnosed with depression and bipolar disorder. He has been prescribed medications for these diagnoses. He has alleged that he experiences hallucinations."

¶ 69    Based on Venditti's testimony concerning the absence of defendant's sex offender evaluation, the trial court would have been authorized to cause an investigation to be made into these factors. See *Clark*, 119 Ill. 2d at 17. However, the record shows evidence was considered by the trial court supporting its finding that defendant could not be rehabilitated before the expiration of the juvenile court's jurisdiction, to ameliorate any risk to public security. Its finding on defendant's likelihood of rehabilitation was based on the evidence presented and not an abuse of discretion.

¶ 70    We now move on to defendant's contention that his trial counsel was ineffective for failing to file and pursue a ruling on a motion to suppress confessional statements made to Officer Meeks on August 11, 2015. He argues that, based on the totality of the circumstances, his statements to Meeks were involuntary and, therefore, a motion for suppression of those statements had a reasonable probability of success, affecting the outcome of the trial.

¶ 71    A successful claim of ineffective assistance of counsel requires a showing of both deficient representation and prejudice. *Strickland v. Washington,* 466 U.S. 668, 690 (1984). In asserting a claim of ineffectiveness, the defendant must overcome a strong presumption that his or her counsel's inaction resulted from sound trial strategy and not incompetence. *People v. Wiley,* 205

Ill. 2d 212, 230 (2001). Generally, the decision of whether to file a motion to suppress is a matter of trial strategy and "therefore one in which the court will not indulge a hindsight analysis to determine whether the attorney's decision was reasonably adequate under the circumstances." *People v. Bryant,* 128 Ill. 2d 448, 458 (1989). Hence, to prevail a defendant must show that a reasonable probability existed that the motion would have been granted and the outcome of the trial would have been different had the evidence been suppressed. *People v. Morris,* 229 Ill. App. 144, 157 (1992). We decide this issue *de novo. People v. Chapman,* 194 Ill. 2d 186, 217 (2000).

¶ 72    In the present case, the record shows that trial counsel's failure to file a motion to suppress defendant's confession to Meeks was not part of a sound trial strategy. Notwithstanding an analysis of the totality of the circumstances regarding defendant's confession, trial counsel's own testimony at the hearing on defendant's post-trial motions belies any serious consideration that her omission in filing a suppression motion was reasonably adequate. See *supra* ¶ 48; see also *People v. Kerwin*, 159 Ill. 2d 436 (1994) (an attorney rendering effective assistance to a client would know that a judge is presumed to only consider admissible evidence in a trial). As such, we will analyze whether defendant's confessional statement to Officer Meeks was voluntary under the circumstances and determine if a reasonable probability existed that the motion to suppress that statement would have been granted.

¶ 73    Defendant's argument on the voluntariness of the statement does not frame his interaction with Officer Meeks as a custodial interrogation. His argument is based on the totality of the circumstances surrounding his interaction with police. On August 11, 2015, defendant was 17 years old. He suffered auditory and visual hallucinations, felt hopeless and suicidal. He had been prescribed medications to treat mental health afflictions earlier in his life. Shortly before Meeks arrived at defendant's home, he had been angrily confronted by his uncle, Marco G., who had

tossed a chair across the room and pushed a table toward him. Defendant argues that he "had been traumatized by his uncle and was emotionally drained and mentally unstable at the time he was being interrogated by law enforcement, raising the question of the voluntariness of the statement."

¶ 74    To determine the voluntariness of a confession, including one from a juvenile, the court looks to the totality of the circumstances. *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996). Factors to consider include individual aspects of the accused (age, intelligence, background, experience, mental capacity, education, physical condition, and experience with the criminal justice system), and the nature of the interrogation (the legality and duration of the detention, the duration of the questioning, and any physical and mental abuse by police). *Gilliam*, 172 Ill. 2d at 500–01. No one factor is dispositive. *Gilliam*, 172 Ill. 2d at 500. "The benchmark of voluntariness is not whether the defendant would have confessed in the absence of interrogation but, rather, whether the defendant's will was overborne at the time of the confession." *People v. Brown*, 169 Ill. 2d 132, 144 (1996).

¶ 75    The taking of a juvenile's confession is a "sensitive concern." *In re G.O.,* 191 Ill. 2d 37, 54 (2000). The "greatest care" must be taken to assure that the confession was not coerced or suggested and that "it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *In re G.O.,* 191 Ill. 2d at 54. This court also recognizes a "concerned adult" factor in considering whether the juvenile, either before or during interrogation, had an opportunity to consult with an adult interested in his welfare. *People v. Cunningham*, 332 Ill. App. 3d 233, 243 (2002).

¶ 76    "Interrogation" refers to express questioning as well as "any words or actions on the part of the police, other than those normally accompanying arrest and custody, that the police should

know are reasonably likely to elicit an incriminating response from a suspect." *People v. Jackson*, 374 Ill. App. 3d 93, 106 (2007), quoting *People v. Olivera*, 164 Ill. 2d 382, 391-92 (1995).

¶ 77    As noted, defendant does not aver that his interaction with Meeks was conducted in a custodial setting. Officer Meeks was investigating a report that defendant had sexually assaulted M.G. and B.G. He met with defendant and his parents in the kitchen with another officer present. Meeks asked defendant to explain what had happened that night. Defendant responded that he had come home from work when confronted by his aunt and uncle about assaulting B.G. and M.G. Meeks testified that defendant said the accusations were true before going in to some detail about the details of touching his cousins. The evidence does support the notion that defendant may have been intimidated by his uncle after having been confronted. However, Marco G. and his family had since left defendant's home and contacted police, leaving defendant with his parents. Officer Meeks merely asked defendant to explain what had happened based on the received report of sexual assault. Following defendant's statements to Meeks, he was not arrested. Based on the evidence presented, there is nothing to indicate defendant's statements to have been coerced or the product of his will overborne. The officer's request that defendant explain what happened does not evidence an action police knew would likely elicit an incriminating response. As defendant's statements to Meeks were the product of a non-custodial, non-interrogative interaction within the confines of his own home with his parents present, the facts do not support the existence of a reasonable probability that the trial court would have found defendant's statement to be involuntary. Although we acknowledge defendant's trial counsel's failure to file the motion to suppress defendant's statements was not a sound trial strategy, defendant has not demonstrated that counsel's assistance "fell below an objective standard of reasonableness and that, but for

counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *People v. Downs*, 2017 IL App (2d) 121156-C, ¶ 39.

¶ 78 Defendant additionally contends his trial counsel was ineffective for failing to require the State to demonstrate that the indictment set forth the dates of the alleged offenses as nearly as could be done. In his opening brief presented to this court, defendant does not provide citation to any authority to support this contention, except to point out the existence of section 111-3(a)(4) of the Code of Criminal Procedure, and his trial counsel's admission that the dates of the ten offenses charged were "difficult to pinpoint when those *** offenses occurred."

¶ 79 Defendant's contention on this issue is insufficient per our supreme court rules. An argument must "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). However, this forfeiture is not as punitive to defendant's appeal as it may appear on its face because the alleged vague nature of the indictment is argued properly in his next contention.

¶ 80 Defendant next contends that the trial court erred in denying his post-trial motion in arrest of judgment pursuant to section 116-2 of the Code of Criminal Procedure. He argues that the time span alleged in each offense of the indictment were not stated as definitely as possible and in violation of the strictures of section 111-3(a)(4) of the Code of Criminal Procedure.

¶ 81 An indictment that has been challenged for the first time through a posttrial motion in arrest of judgment is subject to the prejudice standard of review. *People v. Benitez,* 169 Ill. 2d 245, 256 (1996). The indictment must sufficiently inform the defendant of the charges against him and be precise enough so that he may not be charged with the same crime again in the future. *People v. Herman,* 347 Ill. App. 525, 532 (2004). If the charging instrument fails to set forth the elements

of the offense, then a motion in arrest of judgment, once made, must be granted. *Herman,* 347 Ill. App. 3d at 532.

¶ 82    "A charge shall be in writing and allege the commission of an offense by *** [s]tating the date and county of the offense as definitely as can be done." 725 ILCS 5/111-3(a)(2) (West 2018). "A motion in arrest of judgment attacking the indictment, information, or complaint on the ground that it does not charge an offense shall be denied if the indictment, information or complaint apprised the accused of the precise offense charged with sufficient specificity to prepare his defense and allow pleading a resulting conviction as a bar to future prosecution out of the same conduct." 725 ILCS 5/116-2(c) (West 2018).

¶ 83    All ten counts in the indictment allege the charged offenses occurred "between August 18, 2013, and June 9, 2015." Counts I-V allege offenses committed against M.G., while counts VI-X allege offenses committed against B.G. With respect to section 111-3(a)(4) of the Code of Criminal Procedure, the State "is not required to prove the precise date on which the offenses occurred, but must at least give some indication in the indictment as to when the offenses occurred." *People v. Guerrero*, 356 Ill. App. 3d 22, 27, 292 (2005). In *Guerrero* the court noted that, "[t]he date of the offense is not an essential factor in child sex offense cases." *Id.* The court further noted that in cases involving sexual abuse of children, "flexibility is permitted regarding the date requirement" in section 111-3(a)(4). *Id.* "As long as the crime occurred within the statute of limitations and prior to the return of the charging instrument, the State need only provide the defendant with the best information it has as to when the offenses occurred." *Id.*

¶ 84    Here, we find that the indictment apprised defendant of the precise offenses charged with enough specificity to allow preparation of his defense. The indictment included all the essential elements required by section 111-3(a) of the Code of Criminal Procedure and provided defendant

with notice of the nature of charges against him. The indictment stated the name of the offenses, cited the statutory provisions alleged to have been violated, set forth the nature and elements of the offenses charged, stated the range of dates and the county of the offense, and stated the name of the accused. To reiterate, the date of the offense is not an essential factor in child sex offense cases (see *Guerrero*, 356 Ill. App. 3d at 27), and therefore any failure to include the precise date of the offense does not render an indictment insufficient. Therefore, we cannot find error with the trial court's denial of defendant's post-trial motion in arrest of judgment.

¶ 85    Finally, defendant contends that the trial court erred in its judgment that the State proved defendant guilty on all counts charged beyond a reasonable doubt.

¶ 86    The State has the burden of proving beyond a reasonable doubt each element of an offense. *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979); *People v. Gray*, 2017 IL 120958, ¶ 35. When a defendant challenges the sufficiency of the evidence, a court of review must determine "whether, [after] viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *Gray*, 2017 IL 120958, ¶ 35. It is not the role of the reviewing court to retry the defendant. *In re Q.P.*, 2015 IL 118569, ¶ 24. Rather, it is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *People v. Bradford*, 2016 IL 118674, ¶ 12. Therefore, a court of review will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *Bradford*, 2016 IL 118674, ¶ 12. A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *Gray*, 2017 IL 120958, ¶ 35.

¶ 87 We begin our analysis of defendant's final contention with his argument that the State failed to provide sufficient evidence of the use or threat of the use of force by defendant as to counts I-V regarding his actions with M.G. Section 11-1.30(b)(ii) of the Criminal Code provides that "[a] person commits aggravated criminal sexual assault if that person is under 17 years of age and *** commits an act of sexual penetration with a victim who is at least 9 years of age but under 13 years of age and the person uses force or threat of force to commit the act." 720 ILCS 5/11-1.30(b)(ii) (West 2018).

¶ 88 In Illinois, "force or threat of force" means "the use of force or violence, or the threat of force or violence, including but not limited to the following situations: (1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believed that the accused had the ability to execute that threat; or (2) when the accused has overcome the victim by the use of superior strength or size, physical restraint or physical confinement." 720 ILCS 5/11-0.1 (West 2018). The use of force or the threatened use of force is an essential element of aggravated criminal sexual assault. *People v. Pearson*, 252 Ill. App. 3d 1, 12 (1993). The element of force refers to actions of the defendant that physically compel the victim to submit to the act of sexual penetration. *People v. Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 74. Force requires something more than the force inherent in the sexual penetration itself. *Id.* Force can be established by evidence that the defendant used his bodily inertia to prevent the victim from disengaging. *Id.*

¶ 89 To prove defendant guilty of Counts I-V, the State was required to show that defendant committed an act of sexual penetration by use of force or threat of force against M.G. five times within the dates alleged in the amended indictment, or August 18, 2013, to May 9, 2015.

¶ 90    M.G. testified that on at least ten occasions in defendant's "new house", defendant "would put his hand around [M.G.'s] waist and [defendant's] penis would have been in [M.G.'s] anus." M.G. described the feeling of defendant's hands on his waist "Like I wouldn't be able to get out." He testified that he did try to get away from defendant but was unable to "Because I was very weak and he always held on very tight."

¶ 91    In its findings of defendant's guilty, the trial court stated that M.G. credibly testified "that the defendant would place his hands around [M.G.'s] waist and insert his penis into [M.G.'s] anus and [M.G.] felt he was unable to get out of the defendant's grasp because he was very weak and the defendant was holding him very tight."

¶ 92    Without making an ultimate finding as to the credibility of M.G.'s testimony regarding the number of sexual acts with defendant in the "new house", M.G.'s testimony was sufficient for a finding that defendant used force in penetrating his anus. A rational trier of fact considering M.G.'s trial testimony could have inferred that defendant used force to continue an act of sexual penetration using his grip on M.G.'s waist, his superior size and strength, and his bodily inertia to prevent M.G. from disengaging. See *People v. Alexander*, 2014 IL App (1st) 112207, ¶ 54 (a complaining witness's testimony that defendant used his body weight to continue an act of penetration thereby preventing her escape was sufficient for a rational trier of fact to conclude that force was used to complete the sexual assault). Thus, we cannot say that no rational trier of fact could find that force was used to complete the sexual assault based on M.G.'s testimony.

¶ 93    We now move to defendant's argument that after viewing the evidence in the light most favorable to the State, the trial court could not have found defendant guilty beyond a reasonable doubt. He argues that the testimony of M.G. and B.G. was vague, improbable, incomplete and inconsistent, and insufficient to support of finding of guilt beyond a reasonable doubt. Further,

defendant avers that the testimony of other trial witnesses raises a reasonable doubt of the veracity of M.G. and B.G.'s testimony.

¶ 94    M.G. and B.G.'s statements to Officer Tunney on August 17, 2015, as well as those made to Rhiannon G. in August 2015, were admitted into evidence pursuant to section 115-10(a)(2) of the Code of Criminal Procedure. 725 ILCS 5/115-10(a)(2) (West 2016). Section 115-10 allows for the admission of "testimony of an out of court statement made by a victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim." 725 ILCS 5/115-10(a)(2) (West 2016). "Section 115-10 was originally passed in response to the difficulty in convicting persons accused of sexually assaulting young children." *People v. Holloway*, 177 Ill. 2d 1, 9 (1997). "This difficulty occurs because children's testimony in sexual assault cases is often inadequate." *Holloway*, 177 Ill. 2d at 9. Our supreme court has recognized the probative value of section 115-10 statements because a videotaping a child victim's account of abuse closer in time to the abuse "preserves the account while it is still fresh in the child's memory; in addition, it allows for the examination of the conditions prevalent at the time of the child's initial complaint." *People v. Bowen*, 183 Ill. 2d 103, 115-16 (1998).

¶ 95    The testimony given by the minors at trial was often inconsistent with their section 115-10 statements to Tunney and Rhiannon G. However, the trier of fact is free to accept or reject as much or as little of a witness's testimony as it pleases. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85. "It is not the role of the reviewing court to substitute its judgment for that of the trier of fact with respect to the weight of the evidence, conflict in the testimony or witness credibility." *Corral*, 2019 IL App (1st) 171501, ¶ 71. If the trier of fact fails to adequately to resolve conflicts in the testimony, a reasonable doubt of defendant's guilt may exist.

¶ 96    Defendant's Exhibit E, a warranty deed reflecting his father's sale of the "old house" or "blue house" on July 13, 2012, was properly admitted into evidence. Therefore, any misconduct by defendant against the minors alleged to have occurred at that residence can not be used as the basis for conviction as such acts would fall outside the dates alleged in the amended indictment (August 18, 2013, to May 9, 2015). With the foregoing in mind, we will recount the trial court's specific findings as to each minor victim.

¶ 97    Regarding M.G., the trial court found as follows:

> "[M.G.] credibly testified that the had a close relationship between the two families. They saw each other often. Sometimes it would be weekly. He testified again that the defendant was larger than him and that he participated in wrestling at school. He also indicated through his testimony at trial that his penis would touch his anus, that he would place it inside his anus, that it occurred more than ten times from preschool until the last time when he was ten years old.
>
> ***
>
> He further said that the defendant told him if he ever told his mother or father that he would get in trouble and it meant his parents wouldn't care for him anymore.
>
> The sexual contact he testified occurred more than five times while he was in third grade and most likely more than five times while he was in fourth grade when he was ten years old. He indicated that the majority of the sexual assaults occurred in the second house either in the defendant's mom's room *** and indicated on cross that it was more than ten times. It also occurred in the defendant's room as well.
>
> ***

It is quite clear from the evidence that the Court watched that the father was very upset, very angry. He banged the table at one point in time and asked [M.G] why did he let the defendant do this to him. They recorded their statements and their statements, although there may be some variances, were consistent with what was told to [Inspector Tunney] as well as what they testified in court.

\*\*\*

It is quite clear in the interview process that [M.G.] had such difficulty talking to [Inspector Tunney] about what had occurred. He was nervous. He cried. He testified he didn't even want to go that day but the parents told him he had to be brave."

Regarding B.G., the trial court found as follows:

"[B.G.] \*\*\* testified credibly that the defendant put his penis in her butt. She was in second grade at the time, eight years old. She had indicated that it occurred most every Sunday and again that they were close friends. It is noted for the record as well that the minors' father and the defendant's mother are siblings.

She said it occurred in the mom's room, that he held her waist and his penis was inside her butt. It occurred about five times in his mom's room. She also testified that she saw the defendant place his penis in her brother's butt. She also said it was an emotional disclosure.

\*\*\*

There was testimony as well that during this time of the alleged sexual assault that [B.G.] had trouble and was soiling her pants and both minors suffered from constipation. She also corroborated that it occurred both in the defendant's room and his mother's room

at the houses. She also testified that her parents told her not what to say but to tell the truth when she went to the [Inspector Tunney] interview.

She also testified [that] at one occasion when a nurse asked her back in July 2015 if anyone had ever touched her, she denied it. She said didn't want to say anything at that time. She also said she didn't disclose to her parents earlier because her brother said if she told, they would be the ones that would get in trouble and would go to jail."

¶ 98    There certainly were inconsistencies between the minors' section 115-10 statements to Tunney and Rhiannon G., and trial testimony. M.G. made conflicting statements about where his encounters with defendant took place. At trial, he testified that the incidents occurred in both defendant's "new house" and "old house." The September 18, 2015, recording made between M.G. and his mother was played in court and determined that he stated the incidents happened only in the "old house" and he told Rhiannon G. that the encounters did not occur in the "new house."

¶ 99    In his August 17, 2015, interview with Tunney, M.G. said that he only remembered defendant touching him the first time, the last time, and one other time; the first time having occurred at defendant's "old house." M.G. stated in the interview with Tunney that he and his family would visit defendant's family about one a week, but that the contact didn't happen every time they went there. He could not be sure whether the incidents happened more than five times when questioned by Tunney. Additionally, he could not recall anything happening with defendant or how many times when first questioned by his father, Marco G.

¶ 100   M.G.'s trial testimony was inconsistent as to how often the contact with defendant occurred, ranging from approximately three times to "more than 20 times." He stated that he knew the incidents occurred many times because it usually happened every time, most of the time, or the majority of the time his family visited defendant's home. He testified that the last time defendant

touched him he was ten years old and in fourth grade. During his fourth-grade year, M.G. said that the contact occurred more than ten times, most frequently in defendant's mom's room in the new house. He explained in his trial testimony that during his prior statements to his parents and Tunney he had not remembered certain things and had not wanted to talk about the incidents because he was scared that his parents "were just keeping quiet" and would be angry with him.

¶ 101   B.G.'s trial testimony also contained inconsistencies from her section 115-10 statements. Her statements during the August 17, 2015, interview with Tunney is devoid of an actual number of times the incidents with defendant occurred, except to say that it happened all the times she and her family visited defendant's house, "but sometimes not." Sometimes, she stated in the interview, the contact occurred in defendant's mom's room and sometimes in defendant's room. She stated to Tunney that it occurred when she was eight, sometimes seven, and six years old.

¶ 102   In her trial testimony, B.G. said that the contact occurred more than three times in defendant's mom's room, or five times. She testified that it occurred in defendant's room more than three times, five times, or more than five times. The contact with defendant occurred while she was in second grade when she was eight years old, almost every weekend when her family visited defendant's home. She could not remember it happening while she was in first grade.

¶ 103   "The mere existence of conflicting evidence at trial does not require a reviewing court to reverse a conviction." *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67, quoting *People v. Goodar*, 243 Ill. App. 3d 353, 357 (1993). "It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *Peoples*, 2015 IL App (1st) at ¶ 67, quoting *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 22. It is the responsibility of the trial court as the trier of fact to determine each minor's credibility, the weight to be given to

their testimony, and resolution of any inconsistencies and conflicts in the evidence. *People v. Starks*, 2014 IL App (1st) 1221169, ¶ 51; *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

¶ 104    The trial court found that M.G. and B.G. testified credibly. It recounted that M.G. testified credibly that defendant's penis had touched the inside of M.G.'s anus more than five times while he was in third grade, and more than five times while he was 10 years old in fourth grade. Both findings put the incidents within the time specified in the amended indictment. The trial court acknowledged that M.G. had difficulty speaking with Tunney in the August 17, 2015, interview about what had occurred with defendant due to being nervous. Both M.G.'s testimony regarding his reluctance to speak for fear of his parents becoming upset, as well as his father's anger upon learning what defendant had done to the children support that finding.

¶ 105    The trial court also found that B.G. credibly testified that defendant put his penis in her butt when she was eight years old, in second grade, most every Sunday that her family visited defendant's home. The trial court found her testimony that it occurred in five times in defendant's mom's room credible.

¶ 106    Viewed in the light most favorable to the State, the trial court's credibility determinations were not unreasonable. The minors' testimony coupled with testimony of Officer Meeks in which he recalled defendant's admission to the accusations of B.G. and M.G. on the evening of August 11, 2015. Defendant admitted to Meeks "that he touched [M.G.'s] penis and then he had [M.G.] touch his penis and then he stated that he wanted to experiment was his word, and that [defendant] placed his *** penis between the butt cheeks of [M.G.]" and said "he had committed similar acts with [B.G.], inappropriate touching and had also placed his penis between her butt cheeks." While Meeks's testimony was not wholly corroborative of the minors' testimony as defendant told him he "may" have penetrated M.G.'s butt cheeks and did "similar things" with B.G., it supports the

trial court's finding that defendant did commit acts of sexual penetration with both minors. The testimony of a single witness, if deemed credible, is sufficient to support conviction. *People v. Vannote*, 2012 IL App (4th) 100798, ¶ 48.

¶ 107   Based on the foregoing, the trial court's finding that the evidence presented was sufficient to find defendant guilty on counts I-V in violation of section 11-1.30(b)(ii) of the Criminal Code and counts VI-X in violation of section 11-1.30(b)(i) of the Criminal Code were not so improbable or unsatisfactory as to create a reasonable doubt of his guilt.

¶ 108                                   III. CONCLUSION

¶ 109   For the foregoing reasons, the judgment of the circuit court of DeKalb County is affirmed.

¶ 110   Affirmed.